UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
MARCIA GLICK, o/b/o JULES GLICK,

        Plaintiff,

-against-

CHARLES E. JOHNSON, Acting Secretary of the
Department of Health and Human Services,

        Defendant.
------------------------------------------------------------x

DEC - 2011

NOT FOR PUBLICATION
MEMORANDUM & ORDER
09-CV-0666 (CBA)

AMON, Chief United States District Judge:

      Plaintiff Marcia Glick ("plaintiff") filed this action on behalf of her father, Jules Glick ("Glick"), seeking review of the Secretary of Health and Human Services' decision denying Medicare coverage and payment for skilled nursing facility ("SNF") services furnished by the Hebrew Home for the Aged ("Hebrew Home") to Glick between March 20, 2008 and April 2, 2008. Both parties have moved for judgment on the pleadings. For the reasons stated below, the case is remanded for further administrative proceedings.

## PROCEDURAL HISTORY

      Glick received care at Hebrew Home beginning on March 3, 2008. On or about March 17, 2008, plaintiff was notified that Medicare would terminate coverage beginning March 20, 2008. (Tr. 161.) The explanation for terminating coverage was that Glick had met his short and long term occupational and physical therapy goals during the therapy from March 3, 2008 through March 17, 2008, and further therapy was not medically necessary. (Tr. 162.) Plaintiff appealed this determination to the Quality Improvement Organization ("QIO") authorized by Medicare to conduct an independent review of Medicare's decision to terminate coverage. (Tr. 157, 160.) On March 20, 2008, IPRO, the QIO for New York State, found Medicare's decision to terminate coverage appropriate, because Glick had achieved rehabilitative goals, was medically stable, was taking only

1

oral medications, and only required assistance with activities of daily living; therefore, he no longer needed care at an SNF. (Tr. 157-59.)

On or about March 22, 2008, plaintiff requested reconsideration. (Tr. 94.) Plaintiff supplied additional information, in the form of her own statement dated March 26, 2008, and a consultation examination report by Dr. Michael Wechsler, dated March 25, 2008. (Tr. 91-92.) On or about March 31, 2008, Medicare Qualified Independent Contractor ("QIC") Maximus Federal Services upheld the denial of coverage starting March 20, 2008, reasoning that SNF level care was not medically necessary. (Tr. 74-78.) On or about April 10, 2008, plaintiff requested a hearing before an Administrative Law Judge. (Tr. 71.) Administrative Law Judge J. Dell Gordon (the "ALJ") held a hearing on June 16, 2008. (Tr. 163-176.) On July 3, 2008, the ALJ denied plaintiff's request for coverage on the ground that, as of March 20, 2008, Glick did not require treatment at a skilled nursing facility. (Tr. 33-40.)

On or about August 7, 2008, plaintiff requested Medicare Appeals Council review. (Tr. 30-31.) Plaintiff submitted new evidence to the Medicare Appeals Council, consisting of an undated letter from Glick's urologist Dr. Wechsler, a letter dated August 14, 2008 from Dr. Michael H. Cohen, and a letter dated August 26, 2008 from Dr. Elizabeth Haberfeld. Plaintiff also asserted that her father had been recertified for skilled nursing care from March 26, 2008 through April 2, 2008. (Tr. 25-28, 31-32.) On November 18, 2008, the Medicare Appeals Council concluded that there was no basis for changing the ALJ's decision, and adopted it, making it the Secretary's final decision. (Tr. 3-7.) On February 17, 2009, plaintiff filed this action, seeking review of the Secretary's decision.

## BACKGROUND

*a. Medical Evidence*

On March 3, 2008, following a February 27, 2008 transurethral resection of the prostate gland performed at Columbia Presbyterian Hospital, Glick, aged 83, was admitted to Hebrew Home

for short-term rehabilitation. (Tr. 100, 103.) Glick suffered from Parkinson's disease. (Tr. 103.) Progress notes from March 3, 2008 reflect that Glick was alert and responsive, able to make his needs known, continent of bowel, and in no acute distress. (Tr. 100.) Glick had a Foley catheter in place and needed one person to assist with toileting and all aspects of activities of daily living. (Tr. 100.)

On March 4, 2008, Glick was evaluated by an occupational therapist. (Tr. 103-04.) Glick's primary diagnosis was urinary retention and a urinary tract infection following a transurethral resection. (Tr. 103.) He was referred to the occupational therapist in order to establish a baseline. (Tr. 103.) The occupational therapist's assessment was that Glick should receive therapy five times a week for two weeks to maximize his functional ability in preparation for his return home. (Tr. 104.) Goals included tolerating standing for 10-15 minutes for daily living tasks, toileting himself, complete bed mobility, and transfer to various surfaces. (Tr. 104.) The same day, Glick was evaluated by a physical therapist. (Tr. 108-10.) He was referred because of functional regression and gait dysfunction. (Tr. 108.) The physical therapist noted that Glick lived with his son in a home with 14 steps and a bannister. (Tr. 108.) Ranges of motion were full in the extremities, and motor strength was 3/5. (Tr. 108.) The physical therapist recommended balance transfer training and gait training. (Tr. 109.)

Dr. Zachary Palace ordered Glick to receive restorative physical therapy five times per week, at a minimum of 150 minutes per week, for therapeutic exercises, balance and transfer training, and gait training secondary to functional regression. (Tr. 150.) Glick was also to receive occupational therapy at the same frequency, for activities of daily living training, transfer training, standing balance/tolerance, secondary to diminished activities of daily living and functional regression, and urinary retention. (Tr. 150.) Both courses of therapy were to be finished March 18, 2008. (Tr. 150.)

In progress notes dated March 17, 2008, Hebrew Home staff note that Glick "has been stable with no significant changes," remains alert and oriented as to time, space and person, and is "able to

express his needs," though he has periods of short term memory loss. (Tr. 96.) Glick was eating well and had gained weight. (Tr. 96.) The notes record an estimated discharge date of March 19, 2008. (Tr. 96.) The notes also record that Glick's long term goals were "to be independent with his ADL's and ambulate with a rolling walker." (Tr. 96.) On March 18, 2008 the physical therapist reported that Glick had demonstrated "significant improvement" in strength, balance, transfer ability and gait, though his gait pattern varied due to fatigue and Parkinson's disease medications. (Tr. 107.) The physical therapist stated that Glick was ready for discharge home. (Tr. 107.)

On March 25, 2008, Dr. Wechsler filled out a report regarding his urology consult. (Tr. 92.) Dr. Wechsler stated that Glick had voided a small amount and the catheter had been replaced. (Tr. 92.) Dr. Wechsler diagnosed urinary retention and stated, "I believe as he gets stronger and is up and about he will be able to urinate." (Tr. 92.) His recommendation was "please continue to give therapy." (Tr. 92.)

*b. Non-Medical Evidence*

Despite receiving notice that Medicare would terminate coverage beginning on March 20, 2008, Glick remained in Hebrew Home until April 2, 2008. In a March 26, 2008 letter, plaintiff reported that her father was "still in a weak condition" after prostate surgery and a blood transfusion. (Tr. 91.) She further stated that Dr. Wechsler, who had performed her father's prostrate surgery, had determined on March 25, 2008 not to remove her father's Foley catheter until April 2, 2008. (Tr. 91.) She reported that her father has advanced Parkinson's disease and that on March 25, 2008, Dr. Wechsler had determined that more physical therapy was necessary. (Tr. 91.) In a submission by plaintiff, stamped April 10, 2008, in further support of her appeal of the termination of coverage, plaintiff asserted that her father had undergone a "prostrate [*sic*] operation" and not only had been weakened by blood loss necessitating a transfusion but also that the anesthesia had made him delirious. (Tr. 71.) She claimed that the physical therapy ordered by his urologist was "vital in

making him more independent and strong enough to be released" and that it was felt that he was not strong enough to be released before April 3, 2008. (Tr. 71.)

Plaintiff testified at the administrative hearing that she felt her father was not ready to be released on March 18, 2008. (Tr. 170, 171.) She testified that, after her father had the surgery, he was "really weak" and "needed a blood transfusion." (Tr. 173.) She further testified that Dr. Wechsler, her father's surgeon, had written a prescription for physical therapy on March 25, 2008, and that her father had been recertified for coverage as of March 26, 2008. (Tr. 172-73.) She testified that a "Dr. Cohen" also felt that her father needed more therapy. (Tr. 171.)

### c. *Evidence Submitted to the Medicare Appeals Council*

Plaintiff submitted new evidence to the Medicare Appeals Council, including an undated letter from Dr. Wechsler, a letter from Dr. Michael Cohen, dated August 14, 2008, and a letter from Dr. Elizabeth Haberfeld, dated August 26, 2008, in addition to her own written statement. (Tr. 25-28, 31- 32.) The undated letter from Dr. Wechsler states that he has taken care of Glick for many years. (Tr. 32.) The letter states that Glick had not required any intervention for an enlarged prostate until found to be in renal failure in February, when a catheter was inserted. (Tr. 32.) Once his renal function returned to normal, Glick underwent prostate surgery on February 27, 2008. (Tr. 32.) The letter also states that post-operatively, Glick had difficulty voiding and his catheter was removed and inserted many times, though he is now voiding on his own. (Tr. 32.) The letter states that from March 19 to April 2, 2008 he needed additional physical therapy and skilled nursing care. (Tr. 32.) Finally, the letter noted that "complicating" Glick's course has been his Parkinson's disease, which was made worse. (Tr. 32.) The letters from the other doctors state their opinion that Glick required "skilled" or "daily" nursing care between March 3, 2008 and April 2, 2008. (Tr. 25, 28.)

### d. *Evidence Submitted Post-Oral Argument*

At oral argument, the Court ordered supplemental briefing. In her supplemental brief, plaintiff submitted copies of additional hospital records otherwise missing from the record. Among

those records are several orders by Dr. Zachary Palace ("Dr. Palace"), one of Glick's treating physicians, dated March 3 and 5, 2008, for personal care services, including: (1) transfer assistance; (2) daily maintenance of Foley catheter; (3) monitoring of vital signs each shift for fever and hypertension; (4) fall precautions; and (5) administering oral medications. (Pl. Supp., Ex. A, P42-P45.) The records further contain medication and nursing notes from March 20 to March 25, 2008. (Pl. Supp., Ex. A, P53-P63, P70-P71.)

The missing records also include an order from Dr. Palace, dated March 25, 2008, for Glick to undergo a physical therapy evaluation, and the corresponding physical therapy evaluation form, dated March 26, 2008, on which the evaluating physical therapist opines that Glick "will benefit from restorative physical therapy service to increase current functional status." (Pl. Supp., Ex. A, at P51-P52.) Additionally, they contain an order from Dr. Palace, dated March 26, 2008 placing Glick on a restorative physical therapy program for five days per week for urinary retention, with special instructions to include gait training, balance training and transfer training for paralysis agitans, and physical therapy notes describing Glick's progress over the course of his restorative physical therapy program from March 26, 2008 to April 2, 2008. (Pl. Supp., Ex. A, P40-P41, P49-P52.)

## DISCUSSION

Plaintiff argues that the case should be remanded for further administrative proceedings. Under the Medicare provisions of the Social Security Act, "[t]he findings of the [Secretary] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g), incorporated into 42 U.S.C. § 1395ff(b); see also Hurley v. Bowen, 857 F.2d 907, 912 (2d Cir. 1988). "Substantial evidence" is "'more than a mere scintilla,'" and means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). A district court's review of the Secretary's determination is limited to "whether the [Secretary] applied the proper legal standards, whether its factual findings were supported by substantial evidence, and whether [the Secretary]

provided a full and fair hearing." Kaplan ex rel. Estate of Kaplan v. Leavitt, 503 F. Supp. 2d 718, 722 (S.D.N.Y. 2007) (quoting Saul v. Apfel, 1998 WL 329275, at *3 (S.D.N.Y.1998)).

   *a. Duty to develop the record*

Claimant argues that the case should be remanded because the ALJ did not adequately develop the record. Specifically, the ALJ failed to request records from Hebrew Home for the period beginning March 20, 2008 and ending April 2, 2008. In the context of social security disability benefits determinations, it is well established that an ALJ "must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009) (internal quotation marks and brackets omitted). "When a claimant properly waives his right to counsel and proceeds pro se, the ALJ's duties are 'heightened.'" Moron v. Astrue, 569 F.3d 108, 113 (2d Cir. 2009) (citing Cruz v. Sullivan, 912 F .2d 8, 11 (2d Cir. 1990)).

At least one court has imported the obligation to develop the record into the context of cases involving Medicare claims. See Chamberlain v. Leavitt, No. 06-CV-0646 (NAM/RFT), 2009 WL 385401, at *8-*9 (N.D.N.Y. February 10, 2009). The ALJ's responsibility to develop the record in the disability context is based on the non-adversarial nature of the proceedings. See e.g. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."). That rationale applies equally in the context of a Medicare coverage determination. Indeed, as the record in this case indicates, the ALJ made statements suggesting that he would handle any "technicalities" and assured plaintiff that there was nothing she had to do. He stated, for example, "All of the considerations of legal technicalities are placed on me to simply address . . . . I am very clear on what's appropriate evidence and what isn't, and you don't have to worry about any of that. You can simply tell me whatever you want to tell me in whatever form you want to tell me, and I will take care of all the technical issues." (Tr. 168.)

Here, the evidence before the ALJ should have alerted him to the need to procure additional records from the period between March 20, 2008 and April 2, 2008. Plaintiff specifically stated that Dr. Wexler felt her father needed more therapy. (Tr. 171.) Plaintiff stated that she believed Dr. Wexler had ordered further therapy, to which the ALJ responded the he would, "of course, go through the file page by page by page before determining finally whether it was appropriate for him to have this [treatment]." (Tr. 172.) Plaintiff then told the ALJ that if he contacted the doctors, they could give him the required evidence, to which the ALJ responded, "Ok. All right." (Tr. 172-73.) Records of treatment from between March 20, 2008 and April 2, 2008 would have been highly probative in this case, as that is precisely the period for which the ALJ was determining whether Glick's claim should be covered. Under the circumstances, it would appear that the ALJ should have made efforts to procure the records in question. However, the Court need not decide that question, because the records are now in evidence.

### b. *New evidence*

Even if the ALJ did not have a duty to develop the record, as in the context of a social security disability action, remand is appropriate in light of the new evidence submitted by plaintiff. A court reviewing the agency's determination must generally base its decision "upon the pleadings and transcript of the record." 42 U.S.C. § 405(g); Mathews v. Weber, 423 U.S. 261, 263 (1976). However, a court may remand a matter to the Secretary to consider additional evidence "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). Materiality requires "'a reasonable possibility that the new evidence would have influenced the Secretary to decide [the] claimant's application differently.'" Estate of Landers v. Leavitt, 545 F.3d 98, 114 (2d Cir. 2008) (quoting Jones v. Sullivan, 949 F.2d 57, 60 (2d Cir. 1991)) (alteration in original).

Here, the new evidence submitted by plaintiff is material to the Secretary's determination. First, the records show that Glick in fact received personal care services between March 20, 2008 and

March 25, 2008, the only period for which Glick was not covered. They include medication and nursing notes evidencing the administration of oral medications, the maintenance of Glick's Foley catheter, and the monitoring of Glick's vital signs and medical condition. (Pl. Supp., Ex A., at P53-P58, P70-P71.) Although personal care services like the ones provided to Glick during the relevant period are ordinarily not covered by Medicare, see 42 C.F.R. 409.33(d)(1), (3), (5), (6), and (12); Falk v. Chater, No. 2:92CV807, 1995 WL 798915, at *4 (D. Conn. October 27, 1995), the regulations provide that such services may be covered in light of a patient's overall condition. Specifically, the regulations provide:

> A condition that does not ordinarily require skilled services may require them because of special medical complications. Under those circumstances, a service that is usually nonskilled (such as those listed in § 409.33(d)) may be considered skilled because it must be performed or supervised by skilled nursing or rehabilitation personnel. For example, a plaster cast on a leg does not usually require skilled care. However, if the patient has a preexisting acute skin condition or needs traction, skilled personnel may be needed to adjust traction or watch for complications. In situations of this type, the complications, and the skilled services they require, must be documented by physicians' orders and nursing or therapy notes.

42 C.F.R. § 409.32(b). "[I]f the patient's overall condition would support a finding that recovery and safety can be assured only if the total care is planned, managed, an devaluated by technical or professional personnel, it would be appropriate to infer that skilled services are being provided." 42 C.F.R. § 409.33(a)(1). Accordingly, in light of Glick's overall condition, it would be possible for an ALJ to determine that the services provided during the relevant period were skilled services.

Moreover, the records show that on March 26, 2008, Glick was placed back on restorative rehabilitation therapy, including: (1) therapeutic exercise; (2) transfer training; (3) gait training; (4) balance training; (5) elevation training; (6) endurance training; and (7) resident education and training. (Pl. Supp., Ex A., at P52.) These services were almost exactly the same services Glick had previously received prior to March 20, 2008. (Tr. 110.) The goals of such therapy included: (1) to ambulate on outdoor surfaces with oversight for over 200 feet; (2) to be independent in car transfers; (3) to negotiate up and down curbs (with oversight); and (4) to cross a street in the time frame of a

stop light change. (Pl. Supp., Ex. A, at P52.) The Secretary does not dispute that such services are covered by the Act. Thus, the ALJ could infer, in the absence of any deterioration in Glick's condition between March 20 and March 25, 2008, that the treatment received during that period should be deemed skilled services covered by Medicare Part A. The determination of whether such an inference is appropriate is best made by the ALJ.

Plaintiff has also shown good cause for her failure to incorporate the new evidence in the record. Although the burden of proving entitlement to Medicare benefits is on the individual seeking Medicare coverage, see Friedman v. Secretary of Dept. of Health and Human Services, 819 F.2d 42, 45 (2d Cir. 1987), plaintiff here appeared *pro se*. As discussed above, the ALJ made affirmative representation's to plaintiff indicating that he would "take care of all the technical issues." (Tr. 168.) When plaintiff specifically indicated that she believed records existed of Glick's treatment after March 20, 2008 and that the ALJ could procure them from his doctors, the ALJ responded, "Ok. All right." (Tr. 172-73.) Although there is no indication that the ALJ intentionally misled plaintiff, given her *pro se* status, the Court finds that she had good cause for not having obtained the records earlier. Accordingly, remand is appropriate to allow the ALJ to consider the new evidence submitted by plaintiff's counsel in this action.

## CONCLUSION

For the reasons stated, pursuant to the fourth sentence of 42 U.S.C. § 405(g), the Secretary's decision is reversed, and the claim is remanded for further administrative proceedings. The Clerk of the Court is directed to enter judgment in accordance with this Order.

SO ORDERED.

Dated: Brooklyn, New York
December 8 , 2011

Carol Bagley Amon
Chief United States District Judge

10